United States District Court
Southern District of Texas
**ENTERED**
May 22, 2023
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:17-cv-283

NICOLE MALBROUGH, *PLAINTIFF*,

v.

JASON DEON HOLMES, *ET AL., DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

This civil-rights and tort case arises from Nicole Malbrough's 2015 hospitalization at the University of Texas Medical Branch (UTMB) following cataract surgery. Malbrough—then in the custody of the Texas Department of Criminal Justice (TDCJ)—claims that correctional officer Jason Deon Holmes sexually assaulted her while she recuperated in a holding cell. Holmes does not deny that the parties had a sexual encounter but maintains that it was consensual.

Malbrough has asserted claims under 42 U.S.C. § 1983 for violations of her Fourth Amendment rights, including unreasonable seizure and

unreasonable, unnecessary, and excessive force. Dkt. 25 ¶¶ 25–33. She also alleges assault and battery under Texas common law.[1] *Id.* ¶¶ 41–46.

Based on the evidence produced at a one-day bench trial as well as the parties' arguments and the applicable law, the court finds and concludes as follows:

- Malbrough did not prove by a preponderance of the evidence that Holmes sexually assaulted her or committed a battery during their encounter.

- Malbrough did not prove by a preponderance of the evidence that Holmes effected an unreasonable seizure during their encounter.

- Malbrough did not prove by a preponderance of the evidence that Holmes used unreasonable, unnecessary, or excessive force during their encounter.

- Holmes has no liability to Malbrough arising from their encounter.

The reasons for these rulings are set out below. Any findings of fact that are also, or only, conclusions of law are so deemed, and any conclusions of law that are also, or only, findings of fact are likewise so deemed.

---

[1] Malbrough also brought claims against UTMB, TDCJ, and two other TDCJ employees. Dkt. 25. She never served the two individual employees. And the court dismissed the claims against UTMB and TDCJ. Dkts. 40; 53.

## I.   FINDINGS OF FACT

### A. The Parties

The plaintiff is Nicole Malbrough, a 37-year-old woman. At the time of trial, she worked for Earth's Financial Freedom, which she describes as a credit-repair company. At the time of the incident, Malbrough was incarcerated at a TDCJ facility in Gatesville, serving a two-year sentence. The defendant is Jason Deon Holmes, a 33-year-old man. He currently works as a longshoreman. At the time of the incident, Holmes worked for TDCJ as a correctional officer, guarding inmates receiving medical care at UTMB.

### B. Jurisdiction and Venue

This court has federal-question jurisdiction over this dispute under 28 U.S.C. § 1331 because this action arises out of 42 U.S.C. §§ 1981, 1983, and 1988. Venue is proper in the Southern District of Texas because the events giving rise to the claims asserted occurred within the district.

### C. The Occurrence

On Friday, September 18, 2015, Malbrough underwent cataract surgery in her right eye at UTMB in Galveston.[2] Post-surgery, she rested in a small cell located at the back of the hospital in an area designated for

---

[2] While Malbrough testified that she believed doctors performed her surgery on September 19, medical records indicate the surgery occurred on September 18. *See* Dkt. 118-1 at 6–8. The court admitted these records as the plaintiff's Exhibit 1.

inmate–patients. The room—accessible by a single, lockable door—consisted of a bed, a television set, a sink, and a toilet. There was a small window in the door. Malbrough occupied her room alone.

She remained at UTMB overnight on Saturday, September 19. As part of his duties, Holmes made routine rounds to check on inmates under the hospital's care. During these rounds, Holmes encountered Malbrough. She alleges that two different sexual assaults ensued over the course of the night; Holmes insists that they engaged in one consensual sexual encounter initiated by Malbrough. Malbrough and Holmes both produced contemporaneous written statements and testified during trial. The court summarizes their testimony below in subparts D and E.

On the evening of Sunday, September 20, during shower time, Malbrough asked Officer Shermika Hopkins for her name and for the name of the male officer she worked with that night and the night before. Dkt. 118-2 at 20.[3] Officer Hopkins supplied both names and asked Malbrough if anything was wrong. *Id.* Malbrough answered no. *Id.*

On Monday, September 21, at around 4:00 a.m., Officer Sharaglyn

---

[3] The court admitted the witness statement of Officer Singleton, and the contemporaneous statements provided by other witnesses, as Plaintiff's Exhibit 2. *See* Dkt. 118-2.

Singleton entered Malbrough's cell to prepare her for discharge. Dkt. 118-2 at 21. When the officer noticed that Malbrough had packed a towel in her bag, she informed her that it belonged to UTMB and could not be transported. *Id.* Malbrough replied that she needed the towel because it contained her attacker's DNA and said that she had been sexually assaulted. *Id.* at 20, 21. Malbrough initially declined to provide more details, instead asking to speak with her family or the unit chaplain. *Id.* at 21.

At around 8:30 a.m., Malbrough related to Chaplain Deborah Phillips and Major Angela Chevalier her account of the attack. *Id.* at 4. She stated that at around 10:00 p.m. on September 19, a male officer entered her cell and attempted unsuccessfully to penetrate her anally with his penis, before inserting himself into her vagina and ejaculating. *Id.* at 4, 15, 17. Malbrough said two different attacks occurred. *Id.* at 4, 17. She told them she had cleaned herself off with the towel, and that she did not report the attack out of fear of retaliation. *Id.* at 4. She agreed to make a written statement and submit to a medical exam. *Id.*

Malbrough's written statement described her attacker as a "light-skinned complexion African[-]American" officer in glasses, wearing a blue short-sleeved polo TDCJ shirt and a keychain around his neck. *Id.* at 12. She claimed that at around 9:00 p.m., he came to her cell door and put a brown

napkin up to the window bearing the phrase, "do you want to jump on this?". *Id.* at 11. She asked, "jump on what?". *Id.* He replied, "this," before walking away. *Id.*

After 10:00 p.m. Malbrough said that Holmes returned, switched the lights on, and tapped on her cell window. *Id.* She pretended to be asleep. *Id.* He proceeded to unlock her door, sliding it open quietly, before he approached her bed and touched her buttocks. *Id.* She jumped up and witnessed him "grabbing on his penis." *Id.* He again asked her if she wanted to do this, to which she answered, "No." *Id.* Malbrough said she told him she was "very sleepy, drowsy, and had been given medication." *Id.* Holmes left but returned two to three hours later, unlocked the door, approached Malbrough, removed his penis from his pants, grabbed her legs, and placed them over his shoulder. *Id.* He then attempted to force his penis into Malbrough's anus. *Id.* When that failed, he inserted his penis into her vagina and violently raped Malbrough. *Id.* She described hearing Holmes's keys rattling during the attack. *Id.* at 12.

Malbrough speculated in her statement that Holmes "heard something or someone," leading him to jump up and run away, leaving her door open. *Id.* at 11. She eventually shut the door, but Holmes returned later in the night, and once again forced his penis into her vagina and ejaculated. *Id.* At that

point she jumped up and pushed him away from her, spilling semen over her legs, feet, and the floor. *Id.* Holmes then left but returned a final time to relay information about getting a fan and to ask if she needed to go to the pill line. *Id.* at 12. She told him no. *Id.*

At around 9:34 a.m. on September 21, Malbrough was examined by a Sexual Assault Nurse Examiner (SANE). According to her report—admitted as Plaintiff's Exhibit 9 and Defense Exhibit 66—the SANE observed blood coming from Malbrough's cervical os but attributed this to menstruation, and found no signs of physical trauma. Dkts. 118-9 at 6–7; 88 at 284–85.

At around 11:58 p.m., after he reported for work, investigators interviewed Holmes about Malbrough's accusations. Dkt. 118-2 at 5. Holmes admitted to consensual sexual intercourse with Malbrough and acknowledged he had violated TDCJ rules but blamed his behavior on a sex addiction. *Id.* at 14. Holmes wrote a brief statement describing the encounter. *Id.*

Chaplain Phillips also provided a witness statement. Dkt. 118-2 at 17. She described how Malbrough told her that she had been raped by an officer who "kept singing a sexual song trying to entice her." *Id.* Phillips also noted that Malbrough repeatedly told Holmes "no" during his attempts to penetrate her, but that she never yelled, screamed, or fought back. *Id.*

In Officer Hopkins's witness statement, she relates that Malbrough asked her on September 20 for her name and the name of the male officer she had worked with the evening before. *Id.* at 20. Hopkins did so and asked Malbrough if anything was wrong; Malbrough answered no. *Id.* Hopkins also notes that Officer Singleton told her that Malbrough was refusing to give up a towel because it contained DNA on it, and that she was crying and claiming she had been raped. *Id.* Malbrough urged Hopkins not to contact her supervisors to report the assault because she wanted to wait until she had returned to her unit to make a report. *Id.*

In Singleton's witness statement, she says that Malbrough refused to hand over a towel because it contained DNA and that she wanted to wait until she had returned to her unit to file a report. Dkt. 118-2 at 21.

Lieutenant Rickey Joe Turner also provided a statement, relating that Malbrough initially resisted providing details of her attack and instead asked to speak with a chaplain. Dkt. 118-2 at 22.

In inmate Tammy Crawford's statement, she reports that on the night of September 19 she observed Holmes enter Malbrough's cell and leave about ten minutes later but did not hear or see any sexual abuse. *Id.* at 16. Crawford also stated that she saw Holmes going to the room across from hers a "noticably [sic] odd amount of times." *Id.*

Holmes ultimately pleaded guilty to violating Texas Penal Code § 39.04, which prohibits correctional officers from having sexual contact with inmates. Dkt. 118-4. The court admitted his judgment of conviction as Plaintiff's Exhibit 4. *Id.*

### D. Malbrough's Testimony and Credibility Findings

Malbrough testified at trial. The court summarizes her testimony as follows.

Malbrough testified that her treating physicians medicated her during the cataract procedure, which caused her to lose consciousness and feel dehydrated, sleepy, and drowsy afterwards. After spending time in a recovery room, UTMB staff placed her in a hospital cell she occupied alone. Malbrough described the cell as small, with a bunk bed, a television, a toilet, and a lockable door that had a window. She wore two hospital gowns, with one facing to the front and the other facing to the back, wearing nothing underneath the gowns. Malbrough also described herself as 5'4" in height.

She testified that she first interacted with Holmes as he made his "rounds," walking around to observe inmate–patients. When Holmes first passed Malbrough's cell, neither said anything. During a later round, however, Malbrough asked Holmes for a fan or some deodorant "because [she] was very hot and sweating." Holmes brought her deodorant but

informed her she would need to request a fan from a nurse. During a later round, Holmes began singing a song popularized by the entertainer Nelly. The song's lyrics include the lines: "It's getting hot in here. So take off all your clothes." He sang this song as he walked past her cell.

During a later check-in, Holmes held up a napkin to her window with the words "do you want to jump on this?" written on it in ink. Malbrough testified that she was confused and asked Holmes "jump on what?", after which he departed. During another round, Malbrough heard him as he walked past her cell and switched the cell lights from off to on. He did this a second time and then tapped "very lightly" on her window. Malbrough testified that she saw him through the window and then "played like [she] was asleep and . . . didn't get up." They had no other communication at that time.

Malbrough testified that Holmes returned yet again. Lying in bed, she heard the cell door unlock and open. She felt Holmes touch her buttocks, jumped up, and observed Holmes "grabbing at his penis." He then asked "did [she] want to do this." She says that she told him no and said that she remained very sleepy and drowsy from her medication and "just wanted to go to sleep." Holmes then exited the cell.

She said that she remained in bed and pretended to be asleep. After "a

little time went by," she heard the door unlock and slide open again. Holmes entered the cell very fast, grabbed Malbrough's legs, pulled her to the edge of the bed, and placed her legs over his shoulders. He attempted to anally penetrate her. Malbrough described the experience as "very uncomfortable" and characterized by "sharp pain . . . like someone was like ripping [her] apart." She said that after Holmes failed to anally penetrate, he raped her vaginally. Malbrough testified that she felt "excruciating pain" because Holmes was "pumping really, really hard, like aggressively." She claimed that he grabbed her ankles very tightly during this encounter. Meanwhile, she "kept asking him to stop," while trying to move and free her legs from Holmes's grasp to kick him away. She indicated that the more she attempted to pull her legs away, the more aroused Holmes seemed. Malbrough described Holmes as "muscular," while her surgery left her feeling weak, dehydrated, and drowsy. She could not push him back or away with her legs and estimated that the encounter lasted for around two minutes. At that point, Malbrough speculated that Holmes "heard something," causing him to abruptly stop, jump, grab his pants, and run out of the cell at around 10:00 or 11:00 p.m. He did not close her door behind him.

Following Holmes's departure, Malbrough sat on her bed for around half-an-hour to an hour. Then, she went to her door to see if she could

observe any other individuals passing by. When she did not, Malbrough returned to the bed. She claims she heard the door slide open again, as Holmes returned to her cell. He once again grabbed her legs, placed them over his shoulder, pulled her to the edge of the bed, and attempted anal penetration. She reiterated her description of feeling "excruciating" pain akin to "being ripped apart." Malbrough said that she "kept asking [Holmes] to stop" and continuously attempted to kick him off. At that point, Holmes inserted his penis into her vagina and "started pumping very hard, extremely hard to the point to where [her] head was hitting the back of the wall." Malbrough denied being physically aroused as Holmes began his attack. While she begged him to stop, he began to ejaculate. She continued kicking her legs, but Malbrough testified that Holmes only pulled her closer. As she finally managed to kick him away, he ejaculated onto her vagina, leg, and the floor below.

Malbrough testified that Holmes then left the room, locking the door behind him. She found herself bleeding and tried to clean up. She sat in bed for a while, then got up to peer out of the door to see if anyone might be passing by, then returned to bed and fell asleep. At some point, Holmes returned and asked Malbrough if she wanted to go to the pill line for medication. He also informed her that she could get a fan from the nurse

there. Holmes made no mention of the attack.

Malbrough testified that she reported the assault the following morning when officers arrived to prepare her for return to Gatesville. She told a female officer that she needed to take the towel she had wiped herself off with, because it carried her attacker's semen. Malbrough said she initially refused to hand over the towel due to fears that TDCJ would attempt to cover up the crime, and that she had preferred to report it to the warden of her unit in Gatesville. She recounted the previous evening's events to the guard. Malbrough testified that she was moved to another cell with different officers. The guards tried to convince her to hand over the towel but she refused. She finally delivered it to a prison ombudsman, who placed it in a brown paper bag and promised to deliver it to the proper authorities.

Malbrough read for the court the written statement she provided to TDCJ on September 21, 2015.[4] She explained her understanding of the disciplinary actions TDCJ had taken against Holmes and his later criminal proceedings. Malbrough also testified about her experiences undergoing a rape kit and SANE exam. She described how after the attack, she felt "excruciating," "throbbing," and "stabbing" pain, as well as bleeding. She also

---

[4] The statement—summarized by the court in subpart C—had already been admitted into evidence as part of Plaintiff's Exhibit 2.

testified that she continues to suffer emotional distress, pain, and torment, including post-traumatic stress disorder, extreme anxiety, and insomnia. Malbrough described how this has negatively affected her family life. She also acknowledged her lengthy criminal past but stated she had never made a false rape accusation.

The court did not find Malbrough's testimony credible, largely due to her multiple past convictions for crimes involving dishonest acts or false statements. Federal Rule of Evidence 609 "governs the admissibility of evidence of convictions for impeachment purposes." *United States v. Jefferson*, 623 F.3d 227, 233 (5th Cir. 2010). Rule 609 provides that in a civil case, evidence of convictions for crimes punishable by death or imprisonment for more than one year must be admitted subject to an analysis under Rule 403.[5] Fed. R. Evid. 609(a)(1)(A).  And "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement."

---

[5] "[T]he exclusion of . . . evidence under Rule 403's weighing of probative value against prejudice . . . has no logical application to bench trials." *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981). Moreover, the court finds that none of the other concerns of Rule 403, such as confusing the issues, undue delay, wasting time, or needlessly presenting cumulative evidence, are implicated by the conviction evidence in this case.

Fed. R. Evid. 609(a)(2). But the rule imposes a limit on admitting convictions "if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later." Fed. R. Evid. 609(b). In that circumstance, the court should only admit the conviction if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect," and the proponent of the evidence gives reasonable notice to the adverse party. Fed. R. Evid. 609(b)(1), (2). For these remote convictions, "the general rule . . . is inadmissibility." *United States v. Cathey*, 591 F.2d 268, 275 (5th Cir. 1979).

The court considered the following convictions for the purposes of impeachment under Rule 609:

- Fraudulent Use of Identifying Information: Defense Exhibit 14 shows Malbrough's conviction for this offense on October 5, 2017. Dkt. 88 at 50–51. Because the court has determined that the elements of this crime require proving—or the witness's admitting—a dishonest act or false statement, and the conviction occurred within the last ten years, the court admitted and considered this evidence in evaluating Malbrough's credibility. *See* Tex. Penal Code § 32.51; *Ethridge v. State*, No. 12-09-190-CR, 2012 WL 1379648, at *17 (Tex. App.—Tyler Apr. 18, 2012, no pet.) (mem. op); Fed. R.

Evid. 609(a)(2), (b); *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 817 (11th Cir. 2017) (holding a witness's "convictions for crimes of falsehood and fraudulent use of another's identification . . . were admissible under Rule 609(a)(2)"). Moreover, as the crime is punishable by imprisonment for more than one year, the conviction is also admitted under Rule 609(a)(1)(A). Dkt. 88 at 51 (noting the degree of offense as a state jail felony); Tex. Penal Code § 12.35 (codifying the punishment range for a state jail felony as "confinement in a state jail for any term of not more than two years").

- Controlled Substance Fraud: Defense Exhibit 17 shows Malbrough's conviction for this offense on January 14, 2014. Dkt. 88 at 63–64. Malbrough was convicted for use of a fraudulent prescription form to obtain a controlled substance. Because the court has determined that the elements of this crime require proving—or the witness's admitting—a dishonest act or false statement, and the conviction occurred within the last ten years, the court admitted and considered this evidence in evaluating Malbrough's credibility. *See* Tex. Health & Safety Code § 481.129; *Grant v. CRST Expedited, Inc.*, No. 1:18-CV-433, 2021 WL 2099314, at *3 (E.D. Tex. March 23,

2021) (noting that crimes involving fraud qualify for admission under Federal Rule of Evidence 609(a)(2)); *United States v. Tracy*, 36 F.3d 187, 192 (1st Cir. 1994) (holding that a conviction for a similar crime, uttering a false prescription, "plainly involves dishonesty or false statement"); Fed. R. Evid. 609(a)(2), (b). Moreover, as the crime is punishable by imprisonment for more than one year, the conviction is also admitted under Rule 609(a)(1)(A). Dkt. 88 at 64 (noting the degree of offense as a third-degree felony); Tex. Penal Code § 12.34 (codifying the punishment for a third-degree felony as imprisonment "for any term of not more than 10 years or less than 2 years").

- Credit Card Abuse: Defense Exhibit 20 shows Malbrough's conviction for this offense on January 14, 2014. Dkt. 88 at 73–74. Because the court has determined that the elements of this crime require proving—or the witness's admitting—a dishonest act or false statement, and the conviction occurred within the last ten years, the court admitted and considered this evidence in evaluating Malbrough's credibility. *See* Tex. Penal Code § 32.31; *Battles v. State*, No. 11-05-166-CR, 2006 WL 1029072, at *3 (Tex. App.— Eastland Apr. 20, 2006, no pet.) (mem. op.) (noting that "credit

card abuse is a crime of deception"); Fed. R. Evid. 609(a)(2), (b). Moreover, as the crime is punishable by imprisonment for more than one year, the conviction is also admitted under Rule 609(a)(1)(A). Dkt. 88 at 74 (noting the degree of offense as a state jail felony); Tex. Penal Code § 12.35 (codifying the punishment range for a state jail felony as "confinement in a state jail for any term of not more than two years").

- Insurance Fraud: Defense Exhibit 36 shows Malbrough's conviction for this offense on September 24, 2012. Dkt. 88 at 142–43. Malbrough's judgment of conviction indicates she received 278 days confinement as punishment, with a 139-day credit. *Id.* Her sentence commenced on September 24, 2012, meaning her release date would have been February 10, 2013. Malbrough gave her testimony on November 7, 2022—less than ten years after her release date. Therefore, the offense is not too remote for the court to consider. *See* Fed. R. Evid. 609(b) ("[T]his subdivision (b) applies if more than 10 years have passed since the witness's conviction *or release from confinement for it, whichever is later*.") (emphasis added). And because the elements of this crime require proving—or the witness's admitting—a dishonest act or statement, the court

admitted and considered the evidence in evaluating Malbrough's credibility. *See* Fed. R. Evid. 609(a)(2), (b); Tex. Penal Code § 35.02; *Grant,* 2021 WL 2099314, at *3.

- Aggravated Assault: Defense Exhibit 25 shows Malbrough's conviction for this offense on January 14, 2014. Dkt. 88 at 90. According to the judgment of conviction, this offense is a felony conviction punishable by imprisonment in excess of one year. *Id.* (noting the degree of conviction as a second-degree felony); Tex. Penal Code § 12.33 (codifying the punishment for a second-degree felony as imprisonment "for any term of not more than 20 years or less than 2 years"). Accordingly, the court admits the evidence under Rule 609(a)(1)(A).

The court has not assigned probative value to Malbrough's remote convictions or to any past or pending indictments that did not result or have not resulted in conviction. *See* Fed. R. Evid. 609 (noting that the rule applies "to attacking a witness's character for truthfulness by evidence of a criminal *conviction*") (emphasis added). Nevertheless, the convictions the court has taken into account seriously impeached Malbrough's character for truthfulness, casting very significant doubt on the credibility of her testimony.

Furthermore, during cross-examination, Malbrough admitted she has a lengthy history of lying and providing false information to obtain money and property. The defendant impeached Malbrough's credibility by inquiring into specific instances of conduct that were probative of her character for truthfulness, including providing false information to police officers and forging signatures. *See* Fed. R. Evid. 608(b); *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995) ("Rule 608 authorizes inquiry only into instances of misconduct that are clearly probative of truthfulness or untruthfulness, such as perjury, fraud, swindling, forgery, bribery, and embezzlement.").[6] Malbrough admitted to giving police officers false information and committing forgeries, and these prior acts were probative of her character for truthfulness.

### E. Holmes's Testimony and Credibility Findings

Like Malbrough, Holmes also testified at trial. The court summarizes his testimony as follows.

---

[6] The court is cognizant that "inquiry into the mere existence of an arrest or indictment is not admissible to impeach the defendant's credibility under" Federal Rule of Evidence 608(b). *United States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir. 1989). Holmes's inquiries into these topics did not affect the court's evaluation of Malbrough's credibility.

Holmes testified that in September 2015[7], he was working at UTMB as a correctional officer. His duties included monitoring inmates and ensuring they remained secure during their hospital stay. He completed rounds every 15 minutes. During one of these rounds, he visited Malbrough's cell and turned on the lights. He noticed that she had her hospital gown "turned backwards for some reason, wearing it like it was a robe," with the opening positioned towards her front. Holmes testified that she wore only one gown. He quickly turned the lights off, told her she needed to reposition her gown, and made a comment to the effect of "nobody really wants to see that." Malbrough responded to the effect of "you know you want to see it." Holmes says he interpreted this comment as "flirting" and "a female inmate messing around with a guard just because [he] was the male at the time."

During a later round, he found Malbrough awake and partially "under the sheets" except for her legs, which were elevated with her knees spread apart. He described the pair making eye contact and said that Malbrough "kind of waived at" him, which he again took as "flirting." He felt that Malbrough "was trying to have some fun that night." Holmes moved on and

---

[7] Holmes incorrectly identified September 15, instead of September 19, as the date of the incident. Again, the court notes that Malbrough and Holmes testified about events which had happened more than seven years earlier.

continued his rounds.

He described their next interaction as a "brief conversation," initiated by Malbrough uttering a "few words . . . towards . . . coming into the cell and . . . having some sexual activities with her." Holmes said something to the effect that he saw her "trying to tease and everything like that." Malbrough gestured to invite him into her room, but Holmes did not oblige. Holmes denied wearing keys around his neck, noting that it would present a security hazard.

At some point after midnight, Holmes checked on Malbrough again. She woke up and Holmes stood by the door staring at her "for a while," and she waived him inside the cell. This time, Holmes accepted the invitation and asked her "what can [he] do for her." She "proceeded to turn with her legs off the bed and open up her legs." At this point he unzipped his pants, pulled them down around his knees, and engaged in brief sexual intercourse with Malbrough, lasting a couple of minutes. Holmes said that Malbrough became physically aroused in the course of their encounter. Under cross-examination, Holmes stated that he ejaculated onto the floor. He denied attempting anal penetration. He stated that he did not physically raise her legs and denied that she ever attempted to fight him off, kick him, scratch him, punch him, scream, or otherwise ask him to stop or give any physical or

verbal indication that the encounter was nonconsensual. Holmes also testified that the cells surrounding Malbrough were occupied by other patients. He noted that two other officers and about three other nurses were also in the vicinity and that the hospital that night was quiet. After completing intercourse, Holmes left the cell.

Holmes testified that they had no other sexual interactions. They encountered each other later, when Holmes completed another round, and Malbrough asked him if she could obtain a fan. After checking with a nurse, Holmes returned to her cell to tell her no. This was their last interaction.

On cross-examination, Holmes read the statement he provided to investigators after Malbrough levelled the accusations. Holmes acknowledged his felony conviction for engaging in sexual intercourse with an inmate. He acknowledged that he had engaged in strength training "on and off" for several years prior to his encounter with Malbrough. Holmes testified that though he had stated in a previous deposition that Malbrough had provided him with oral sex, he could not presently recall every detail of the encounter, which occurred over seven years ago.

The court found Holmes's testimony somewhat credible and certainly more credible than Malbrough's. Though Holmes is, like Malbrough, a convicted felon, the court afforded his conviction for sexual activity with a

person in custody under Texas Penal Code § 39.04—admitted and considered under Rule 609(a)(1)(A)—little impeachment value related to Holmes's character for truthfulness. *See* Dkt. 118-4.

## II.  Malbrough's Claims

### A. Assault

Under Texas law, "the elements of a civil assault mirror those of a criminal assault." *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012); Dkt. 111 at 2. An assault occurs if a person "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." *Loaisiga*, 379 S.W.3d at 256. A plaintiff bears the burden of proving her assault claim by a preponderance of the evidence. *Cowboys Concert Hall-Arlington, Inc. v. Jones*, No. 02–12–00518–CV, 2014 WL 1713472, at *5 (Tex. App.—Fort Worth May 1, 2014, pets. denied) (per curiam) (mem. op).

Based on the evidence submitted at trial, the court finds that Holmes did not assault Malbrough. The court did not find Malbrough's testimony to be credible, and her testimony was the only material evidence indicating an assault occurred. Holmes impeached Malbrough's testimony by establishing her penchant for deceit, dishonesty, and fraud in pursuit of money. And her demeanor on the stand at trial did not otherwise persuade the court of the

truthfulness of her account. No other witness offered any testimony bolstering Malbrough's unpersuasive account of what transpired on the evening of September 19–20, 2015.

The court found Holmes's testimony, describing a consensual sexual encounter initiated by Malbrough, more credible. Though Holmes's testimony was not entirely credible, the court is cognizant that the relevant events occurred more than seven years ago and some discrepancies in memory are unavoidable. And the burden of proof is Malbrough's to carry.

Finally, the court finds the SANE-report evidence—which noted no signs of any physical trauma indicative of a violent sexual assault—as corroborative of Holmes's account and contradictory of Malbrough's. Accordingly, the court finds that Malbrough failed to prove her assault case by a preponderance of the evidence.

## B. Excessive Force

Malbrough brings a § 1983 claim against Holmes, arguing he deployed unreasonable, unnecessary, and excessive force against her in violation of the Fourth Amendment.[8] Dkt. 25 ¶¶ 29–33. However, it is undisputed that at the

---

[8] Malbrough's proposed findings of fact and conclusions of law mention an unreasonable-search violation. Dkt. 111 at 3. However, her live complaint makes no unreasonable-search claim. *See* Dkt. 25. Even if it did, none of the facts or evidence produced at trial support any allegation that Holmes effected a search of Malbrough.

time of her encounter with Holmes, Malbrough was a convicted inmate serving a criminal sentence. Accordingly, her claim sounds in the standards of the Eighth Amendment—not the Fourth.[9] *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (holding that after conviction, "the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified'") (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)); *Berry v. City of Muskogee*, 900 F.2d 1489, 1494 (10th Cir. 1990) ("[C]laims of excessive force against convicted prisoners should be analyzed under the Eighth . . . Amendment."); *Ard v. Rushing*, 911 F. Supp. 2d 425, 428 (S.D. Miss. 2012) (holding that although an incarcerated individual's sexual-assault claim against a guard was "cast in terms of putative violations of the Fourth, Fifth[,] and Fourteenth Amendments, her constitutional rights necessarily flow from the Eighth Amendment"); *Bearchild v. Cobban*, 947

---

[9] The cases Malbrough cites in her proposed findings of fact and conclusions of law involve Eighth Amendment or Fourteenth Amendment instead of Fourth Amendment violations. *See Perry v. Durborow*, 892 F.3d 1116 (10th Cir. 2018) (analyzing the alleged rape of a pretrial detainee by a prison guard); *Hovater v. Robinson*, 1 F.3d 1063 (10th Cir. 1993) (applying the Eighth and Fourteenth Amendments). And because the court finds that the evidence tends to show no attack occurred, Malbrough's constitutional claims would fail under any theory. *See Stockman v. Lowndes Cnty.*, No. CIV.A. 199-CV-182-DD, 2000 WL 33907696, at *4 (N.D. Miss. Aug. 21, 2000) ("[W]hile consensual conduct may violate . . . policy, it carries no constitutional implication.").

F.3d 1130, 1140 (9th Cir. 2020) (citing cases for the proposition that prisoner sexual-assault claims are properly analyzed as Eighth Amendment excessive-force claims); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).

In a sexual-assault case, "a two-part test determines whether a prisoner has established a violation of the Eighth Amendment: 1) the sexual abuse or assault must be objectively sufficiently serious and 2) the prison officials involved must have acted with deliberate indifference, i.e., a sufficiently culpable state of mind." *Ben v. Brinks*, No. EP–13–CV–00023–KC–ATB, 2014 WL 931796, at *2 (W.D. Tex. Feb. 13, 2014) (citing *Harper v. Showers*, 174 F.3d 716, 719–720 (5th Cir. 1999). The plaintiff must prove her case by a preponderance of the evidence. *Harper v. Caddo Corr. Ctr.*, No. 5:19-CV-00587 SEC P, 2022 WL 885840, at *5 (W.D. La. Jan. 19, 2022).

Based on the evidence submitted at trial, the court does not find that Holmes used any force on Malbrough, much less such excessive force as would amount to an Eighth Amendment violation. Again, for the reasons discussed above, the court does not credit Malbrough's account of the events and finds Holmes's testimony more credible. As the court finds that no assault occurred, the Eighth Amendment claim fails on the standard's first prong. Consensual sexual encounters between inmates and correctional

officers, while criminally culpable under Texas law, do not necessarily constitute Eighth Amendment excessive-force violations. *Cf. Olivarez v. GEO Group, Inc.*, 844 F.3d 200, 205 (5th Cir. 2016) (holding in a § 1983 sexual-assault case that an inmate's recorded phone conversations suggesting a consensual sexual encounter with a prison employee were of substantial evidentiary value, because they went to the truth of the defendant employee's consent defense); *Graham v. Sheriff of Logan Cnty.*, 741 F.3d 1118, 1124 (10th Cir. 2013) (holding that an Eighth Amendment excessive-force claim based on sexual abuse must involve "at least some form of coercion . . . by the prisoner's custodians").[10] Moreover, Holmes's guilty plea under Texas Penal Code § 39.04 does not necessarily aid Malbrough's § 1983 sexual-assault claims. *See Hale v. Boyle Cnty.*, 18 F.4th 845, 853 n.5 (6th Cir. 2021) (holding that a prison guard's violation of a Kentucky statute criminalizing sex between guards and inmates did not establish "per-se

---

[10] The court acknowledges that courts in other circuits have taken somewhat different approaches. *See, e.g., Wood v. Beauclair*, 692 F.3d 1041, 1049 (9th Cir. 2012) ("[W]hen a prisoner alleges sexual abuse by a prison guard, we believe the prisoner is entitled to a presumption that the conduct was not consensual."); *Hale v. Boyle Cnty.*, 18 F.4th 845, 853–54 (6th Cir. 2021); *Carrigan v. Davis*, 70 F. Supp. 2d 448, 452–53 (D. Del. 1999) (holding that intercourse between a prison inmate and a guard is a per se violation of the Eighth Amendment). *But see Stockman v. Lowndes Cnty.*, No. CIV.A. 199-CV-182-DD, 2000 WL 33907696, at *4 (N.D. Miss. Aug. 21, 2000) ("[W]hile consensual [sexual] conduct may violate municipal policy, it carries no constitutional implication.").

nonconsent" or otherwise dictate the outcome of a § 1983 sexual-assault suit). For the same reason, Holmes's admitted violations of TDCJ policies do not establish Malbrough's non-consent.

### C. Unreasonable Seizure

Malbrough also claims Holmes effected an unreasonable seizure against her in violation of the Fourth Amendment. For the reasons discussed above, her sexual-assault claims sound in the Eighth Amendment—not the Fourth.[11] Malbrough has not submitted any cases describing what elements might comprise an Eighth Amendment unreasonable-seizure claim. *See* Dkt. 111.

Even under a Fourth Amendment analysis, Malbrough's claims would fail. "To state a claim under § 1983 for unreasonable seizure, [a plaintiff] must demonstrate that (1) she was seized within the meaning of the Fourth Amendment and (2) such seizure was unreasonable." *Velazquez v. City of Westwego*, 531 F.Supp.3d 1142, 1157 (E.D. La. 2021) (citing *Brower v. Cnty.*

---

[11] In her proposed findings of fact and conclusions of law, Malbrough cites *Cerda v. Billingsley* for the proposition that a law-enforcement officer's sexual assault can constitute an unreasonable seizure under the Fourth Amendment. Dkt. 111. ¶ 8; No. SA-09-CA-816-FB, 2011 WL 13238418, at * 5 (W.D. Tex. Mar. 9, 2011). However, *Cerda* involved a non-detained woman who alleged a sexual assault by an officer after she accepted his offer of a car ride. *Id.* at *1. The rights of convicted and incarcerated inmates alleging sexual assault flow from a different constitutional source. *Hare*, 74 F.3d at 638–39.

*Of Inyo*, 489 U.S. 593, 599 (1989). The plaintiff must prove the elements of an unreasonable-seizure claim by a preponderance of the evidence. *Avery v. Boyd*, No. 3:13-cv-939–FKB, 2014 WL 2163442, at *5 (S.D. Miss. May 23, 2014). Based on the evidence submitted at trial, the court does not find that Holmes effected an unreasonable seizure of Malbrough on the evening of September 19–20, 2015. Again, for the reasons discussed above, the court does not credit Malbrough's account of the encounter, finds Holmes's testimony more credible, and is persuaded that the SANE-report findings comport with Holmes's account. As the evidence indicates that no sexual assault occurred, no seizure occurred either, and the claim must fail.

\*     \*     \*

For the reasons stated above, the court finds that Holmes owes no liability to Malbrough related to their encounter. All pending motions are denied as moot. The court will enter final judgment separately.

Signed on Galveston Island this 22nd day of May, 2023.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE